United States District Court
Southern District of Texas
**ENTERED**
January 17, 2024
Nathan Ochsner, Clerk

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| JANE DOES 1–5, | § § § § § § § § § § | |
| Plaintiffs. | | |
| V. | | CIVIL ACTION NO. 4:23-cv-00813 |
| WILLIE OBIANO, | | |
| Defendant. | | |

## MEMORANDUM AND RECOMMENDATION

Pending before me is Defendant's Opposed Motion to Dismiss Plaintiffs' Complaint. Dkt. 21. Having reviewed the briefing, the record, and the applicable law, I recommend that the motion be **GRANTED**.

## BACKGROUND

This case arises out of a long-running conflict between the Nigerian government and the Biafran people, who occupy Southeast Nigeria. In 1967, the Biafrans declared independence from Nigeria, forming the Republic of Biafra. The Nigerian military immediately attempted to reclaim the territory of Biafra, sparking the Nigerian Civil War. The brutal conflict resulted in the deaths of between 500,000 and 2 million people, most from starvation. In 1970, the war ended with the surrender of the Biafrans. The broader conflict, however, has continued to simmer.

Formed in 2012, the Indigenous People of Biafra ("IPOB") is a pro-Biafran organization that aims to establish the independent state of Biafra. According to the Complaint, the IPOB held rallies supporting the restoration of Biafran sovereignty in Nnewi, Anambra State, Nigeria on August 9, 2020 and October 23, 2020. Both events reportedly turned bloody when Nigerian military forces indiscriminately shot at peaceful demonstrators. Plaintiffs allege that the Nigerian military forces who actively participated in this campaign of violence were acting

under the command and control of Willie Obiano ("Obiano"), the then-Governor of Anambra State, Nigeria.

Jane Does 1–5[1] (collectively, "Plaintiffs") are the surviving wives of five men who were purportedly killed at the August and October 2020 protests. Plaintiffs have sued Obiano—who now lives in Spring, Texas—under the Torture Victim Protection Act of 1991 ("TVPA") "for the extrajudicial killings [of their husbands] under color of Nigerian law by Nigerian military forces under [Obiano]'s command and control." Dkt. 1 at 1. Plaintiffs seek compensatory damages, punitive damages, and attorney's fees.

Obiano has filed a Motion to Dismiss Plaintiffs' Complaint. Obiano advances four independent reasons this case should be dismissed: (1) lack of subject matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1) based on the foreign official immunity doctrine; (2) lack of jurisdiction under Rule 12(b)(1) based on the political question doctrine; (3) Plaintiffs' failure to exhaust their administrative remedies under the TVPA; and (4) Plaintiffs' failure to state a claim under Rule 12(b)(6). Because I must consider any jurisdictional attack first, I begin by analyzing Obiano's assertion that this Court lacks subject matter jurisdiction based on foreign official immunity. Because I conclude that Obiano is entitled to foreign official immunity, I need not address the other reasons Obiano offers for dismissal.

## RULE 12(b)(1) LEGAL STANDARD

"Motions filed under Rule 12(b)(1) of the Federal Rules of Civil Procedure allow a party to challenge the subject matter jurisdiction of the district court to hear a case." *Ramming v. United States*, 281 F.3d 158, 161 (5th Cir. 2001). When a party challenges subject matter jurisdiction and simultaneously seeks dismissal with other Rule 12 motions, the court must consider the jurisdictional attack first. *See id.* "This requirement prevents a court without jurisdiction from prematurely dismissing a case with prejudice." *Id.* "[F]oreign-official immunity is a question of

---

[1] In the Complaint, Plaintiffs are first referred to as "Jane Does" in the style of the case, then later referred to as "Jane Roes." I will refer to them as "Jane Does."

subject-matter jurisdiction." *Doe 1 v. Buratai*, 318 F. Supp. 3d 218, 226 (D.D.C. 2018). As United States District Judge Dabney L. Friedrich explained in a virtually identical case:

> When ruling on a Rule 12(b)(1) motion, the court must treat the plaintiff's factual allegations as true and afford the plaintiff the benefit of all inferences that can be derived from the facts alleged. Those factual allegations, however, receive closer scrutiny than they would in a Rule 12(b)(6) context, and particularly because immunity provides protection from suit and not merely a defense to liability, the court must engage in sufficient pretrial factual and legal determinations to satisfy itself of its authority to hear the case. Also, unlike when evaluating a Rule 12(b)(6) motion, a court may consider materials outside the pleadings to evaluate whether it has jurisdiction, such as the complaint supplemented by undisputed facts in the record. Without subject-matter jurisdiction, the court must dismiss the action.

*Id.* (cleaned up).

## ANALYSIS

### A. THE LEGAL LANDSCAPE FOR TVPA CLAIMS AND FOREIGN OFFICIAL IMMUNITY

#### 1. The TVPA

The TVPA provides a civil cause of action to torture victims and representatives of victims of extrajudicial killings. It states:

> (a) LIABILITY.—An individual who, under actual or apparent authority, or color of law, of any foreign nation—
>
> > (1) subjects an individual to torture shall, in a civil action, be liable for damages to that individual; or
> >
> > (2) subjects an individual to extrajudicial killing shall, in a civil action, be liable for damages to the individual's legal representative, or to any person who may be a claimant in an action for wrongful death.

Pub. L. No. 102–256, § 2(a), 106 Stat. 73 (Mar. 12, 1992) (codified as a note to 28 U.S.C. § 1350). The TVPA defines an "extrajudicial killing" as

> a deliberated killing not authorized by a previous judgment pronounced by a regularly constituted court affording all the judicial guarantees which are recognized as indispensable by civilized peoples.

Such term, however, does not include any such killing that, under international law, is lawfully carried out under the authority of a foreign nation.

*Id.* § 3(a).

### 2. *Foreign Official Immunity*

Foreign official immunity is a common law doctrine, first discussed in *The Schooner Exchange v. McFaddon*, 11 U.S. (7 Cranch) 116 (1812). In *Schooner Exchange*, the Supreme Court applied the long-standing principle that ministers of foreign sovereigns are exempt from the jurisdiction of another nation to hold "that the courts of the United States lack jurisdiction over an armed ship of a foreign state found in our port." *Verlinden B.V. v. Cent. Bank of Nigeria*, 461 U.S. 480, 486 (1983). The "narrow holding of *The Schooner Exchange* . . . came to be regarded as extending virtually absolute immunity to foreign sovereigns," albeit "as a matter of grace and comity on the part of the United States, and not a restriction imposed by the Constitution." *Id.*

Under the common law,[2] foreign officials may be entitled to two types of immunity: status-based immunity or conduct-based immunity. *See Doe 1*, 318 F. Supp. 3d at 230.

> Status-based immunity is available to diplomats and head of state and shields them from legal proceedings by virtue of [their] current official position, regardless of the substance of the claim. Conduct-based immunity, at issue in this case, is available to any public minister, official, or agent of the foreign state with respect to acts performed in his official capacity if the effect of exercising jurisdiction would be to enforce a rule of law against the state.

---

[2] After the 1976 enactment of the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. § 1330, 1602 *et seq.*, courts began to analyze immunity for foreign officials under that statute. That practice ended when the Supreme Court decided *Samantar v. Yousuf*, 560 U.S. 305 (2010), which held that determinations of sovereign immunity for foreign officials are governed by the common law, not the FSIA. *See id.* at 320–26.

4

*Id.* (cleaned up).[3] In other words, "conduct-based immunities shield individuals from legal consequences for acts performed on behalf of the state during their tenure in office." *Sikhs for Just. v. Singh*, 64 F. Supp. 3d 190, 193 (D.D.C. 2014) (cleaned up).

> Determination of foreign official immunity is a two-step process:
>
> First, the foreign-official defendant can request a suggestion of immunity from the State Department. If the request is granted, the district court surrenders its jurisdiction. But in the absence of recognition of the immunity by the [State Department], the district court moves to the second step, in which a district court has authority to decide for itself whether all the requisites for such immunity existed. In making that decision, a district court inquires whether the ground of immunity is one which it is the established policy of the State Department to recognize.

*See Doe 1*, 318 F. Supp. 3d at 230 (cleaned up). My inquiry during the second step will result in a finding of immunity if (1) Obiano was a public minister, official, or agent of Nigeria; (2) he acted in his official capacity; and (3) "exercising jurisdiction would 'enforce a rule of law against the state.'" *Id.* at 231 (quoting RESTATEMENT (SECOND) OF FOREIGN RELATIONS LAW § 66(f) (1965)).

**B.    OBIANO IS ENTITLED TO FOREIGN OFFICIAL IMMUNITY**

Plaintiffs acknowledge that Obiano served as Governor of Anambra State from March 17, 2014 to March 17, 2022. Because Obiano's allegedly illegal conduct occurred while he was in office, I must determine whether Obiano is entitled to conduct-based immunity.[4]

---

[3] *Doe 1* involved claims by Nigerian nationals under the TVPA against officials in the Nigerian government, including Obiano, stemming from alleged torture and extrajudicial killings of protesters in Nigeria. In a well-reasoned opinion, Judge Friedrich held that (1) the court could not exercise personal jurisdiction over the Nigerian officials as they had no connection to the District of Columbia; and (2) the Nigerian officials were entitled to conduct-based foreign official immunity. *See id.* Because the United States Court of Appeals for the District of Columbia affirmed Judge Friedrich's dismissal for lack of personal jurisdiction, it did not address the foreign official immunity issue. *See Doe 1 v. Buratai*, 792 F. App'x 6, 10 (D.C. Cir. 2019).

[4] Status-based immunity is not available to Obiano because he is not a current diplomat or head of state. *See Doe 1*, 318 F. Supp. 3d at 230.

At step one, I ask whether Obiano has requested a suggestion of immunity from the State Department. He has not. Moving to step two, I ask whether such a grant of immunity is something the State Department would recognize under established policy. The three aforementioned factors indicate such a grant of immunity is appropriate.

First, it is undisputed that Obiano was Governor of Anambra State at the time of the events at issue, meaning he was a public minister, official, or agent of Nigeria.

Second, it is also undisputed that Obiano's alleged actions were taken in his official capacity. Indeed, Plaintiffs admit that "Obiano possessed command responsibility and effective control over the Nigerian soldiers complicit in the extrajudicial killing of John Does 1-5 under color of Nigerian law acting in concert with Nigerian President Muhammadu Buhari or his agents." Dkt. 1 at 4. Plaintiffs further allege that Obiano "approved all federal military operations" in Anambra State. *Id.* at 8. Taking Plaintiffs' allegations as true, Obiano clearly acted in his official capacity.

Third, I ask whether "exercising jurisdiction would have the effect of enforcing a rule of law against Nigeria." *Doe 1*, 318 F. Supp. 3d at 233. This element allows for immunity when "a judgment against the official would bind (or be enforceable against) the foreign state." *Lewis v. Mutond*, 918 F.3d 142, 146 (D.C. Cir. 2019). Plaintiffs are not suing Obiano in his individual capacity. On the contrary, the Complaint repeatedly connects Obiano's alleged actions to his official capacity as Governor of a Nigerian state and the Nigerian government's decades-long persecution of the Biafrans. Plaintiffs assert that Obiano acted in concert with the President of Nigeria or his agents. Further, Plaintiffs allege that "[p]ublicly disclosing the true names of [Plaintiffs] or [their deceased husbands] or the granular details of the extrajudicial killing[s] . . . would expose [Plaintiffs] to the risk of immediate assassination by the Federal Government of Nigeria." Dkt 1. at 2–3. These alleged facts indicate that my exercise of jurisdiction "would affect how

Nigeria's government, military, and police function, regardless [of] whether the damages come from [Obiano's] own wallet[] or Nigeria's coffers. By interfering with Nigeria's government, a decision would effectively enforce a rule of law against Nigeria." *Doe 1*, 318 F. Supp. 3d at 233. Put another way, "a decision by this Court on the legality of [Obiano's] actions would amount to a decision on the legality of Nigeria's actions." *Id.* As such, I find that the State Department would recognize a grant of immunity in this situation. Thus, Obiano is entitled to conduct-based foreign official immunity.

Some commentators have suggested that the TVPA abrogates common law foreign official immunity. *See* Beth Stephens, *The Modern Common Law of Foreign Official Immunity*, 79 FORDHAM L. REV. 2669, 2704 (2011) ("A blanket grant of immunity to foreign officials who act under color of law would contradict the [TVPA]."). I respectfully disagree. "The text of the TVPA does not mention immunity, and statutes are normally assumed not to displace the common law by implication." Curtis A. Bradley, *Conflicting Approaches to the U.S. Common Law of Foreign Official Immunity*, 115 AM. J. INT'L L. 1, 17 (2021); *see also Samantar*, 560 U.S. at 320 ("The canon of construction that statutes should be interpreted consistently with the common law helps us interpret a statute that clearly covers a field formerly governed by common law."); *Pierson v. Ray*, 386 U.S. 547, 554 (1967) (holding that Congress must give "clear indication that [it] meant to abolish wholesale all common-law immunities" in a statute). Because "the TVPA is silent as to whether any common law immunities are abrogated," I must assume that common law principles of immunity are incorporated into the TVPA. *Doğan v. Barak*, 932 F.3d 888, 895 (9th Cir. 2019) (holding that the TVPA does not expressly or impliedly abrogate foreign official immunity).

### C. A *JUS COGENS* EXCEPTION DOES NOT APPLY TO OBIANO'S FOREIGN OFFICIAL IMMUNITY

"[T]he term 'jus cogens' (literally, 'compelling law') refers to norms that command peremptory authority, superseding conflicting treaties and custom."

7

Evan J. Criddle & Evan Fox-Decent, *A Fiduciary Theory of Jus Cogens*, 34 YALE J. INT'L L. 331, 331 (2009). *Jus cogens* norms "include, at a minimum, the prohibitions against genocide; slavery or slave trade; murder or disappearance of individuals; torture or other cruel, inhuman, or degrading treatment or punishment," and other heinous acts. *Id.* (citing RESTATEMENT (THIRD) OF FOREIGN RELATIONS OF THE UNITED STATES § 702 cmts. d–i, § 102 cmt. k (1987)).

Plaintiffs argue that "violations of *jus cogens* norms of international law are never shielded from accountability" and constitute an exception to foreign official immunity. Dkt. 23 at 8. Plaintiffs rely heavily on *Yousuf v. Samantar*, 699 F.3d 763 (4th Cir. 2012), an appellate decision holding that "under international and domestic law, officials from other countries are not entitled to foreign official immunity for *jus cogens* violations, even if the acts were performed in the defendant's official capacity." *Id.* at 777. Although the Fourth Circuit in *Yousuf* carved out a *jus cogens* exception to foreign official immunity, that decision appears to be an outlier; other jurisdictions—including the Second, Seventh, and Ninth Circuits—have expressly rejected such an exception.[5] *See, e.g., Doğan*, 932 F.3d at 896 (declining "to hold that foreign officials are not immune from suit for violations of *jus cogens* norms"); *Matar v. Dichter*, 563 F.3d 9, 14 (2d Cir. 2009) ("[T]here is no general jus cogens exception to [foreign official] immunity."); *Ye v. Zemin*, 383 F.3d 620, 627 (7th Cir. 2004) ("The Executive Branch's determination that a foreign leader should be immune from suit even when the leader is accused of acts that violate *jus cogens* norms is established by a suggestion of immunity."); *see also Doe 1*, 318 F. Supp. 3d at 234 ("Although the D.C. Circuit has not directly

---

[5] Some courts analyzing foreign official immunity under the FSIA—pre-*Samantar*—declined to apply a *jus cogens* exception. *See, e.g., Belhas v. Ya'alon*, 515 F.3d 1279, 1287 (D.C. Cir. 2008) ("[T]he FSIA contains no unenumerated exception for violations of *jus cogens* norms."); *Siderman de Blake v. Republic of Arg.*, 965 F.2d 699, 718–719 (9th Cir. 1992) (finding no *jus cogens* exception within the text or legislative history of the FSIA). "[A]s the Supreme Court noted in *Samantar*, rules that appellate courts developed for foreign official immunity under the FSIA 'may be correct as a matter of common-law principles.'" *Giraldo v. Drummond Co.*, 808 F. Supp. 2d 247, 250 (D.D.C. 2011) (quoting *Samantar*, 560 U.S. at 322 n.17)).

8

addressed the issue, the circuit's caselaw indicates that *jus cogens* allegations do not defeat foreign-official immunity under the common law.").

The Fifth Circuit has yet to address whether a *jus cogens* exception to foreign official immunity exists. The Fifth Circuit has, however, discussed a possible *jus cogens* exception to sovereign immunity under the Alien Tort Statute ("ATS"). In *Hernandez v. United States*, 785 F.3d 117 (5th Cir. 2015) (en banc), Judge Catherina Haynes, joined by two other judges, issued a concurrence endorsing the idea of a *jus cogens* exception to sovereign immunity under the ATS. *See id.* at 139–42 (Haynes, J., concurring). Favorably citing the Fourth Circuit's *Yousuf* decision, Judge Haynes reasoned that because *jus cogens* violations are so heinous that a sovereign nation cannot authorize them, the sovereign would lack immunity for those violations. *See id.* at 140. In response, Judge Edith Jones, joined by three judges, wrote that such an exception would "create a breathtaking expansion of federal court authority" and "abrogate federal sovereign immunity contrary to clearly established law." *Id.* at 128–29 (Jones, J., concurring). Judge Jones also wrote—quite persuasively—that Judge Haynes's comparisons to foreign official immunity were inapposite to the Fifth Circuit's discussion of American sovereign immunity. The Supreme Court, however, vacated the Fifth Circuit's *en banc* opinion on separate grounds in *Hernandez v. Mesa*, 582 U.S. 548 (2017).

With no binding Fifth Circuit precedent to guide me, I must determine whether to follow the Fourth Circuit's approach and find that a *jus cogens* exception to foreign official immunity exists, or to side with the majority of courts that have refused to recognize a *jus cogens* exception. After carefully reviewing the case law and academic literature, I decline to adopt a *jus cogens* exception. I am persuaded by the reasoning set forth by those courts that have adopted the majority approach that there is no *jus cogens* exception to foreign official immunity. As United States District Judge Otis D. Wright II observed:

> The Court certainly agrees in principle that immunity doctrines should not shield persons who violate *jus cogens* norms. However, allowing such an exception would effectively eviscerate the immunity

> for *all* foreign officials. The question whether there was actually a *jus cogens* violation is inextricably intertwined with the merits of the underlying claim; thus, having a *jus cogens* exception would merge the merits inquiry with the immunity inquiry. This causes two problems. First, foreign official immunity is not just a defense to liability, but an immunity from suit—i.e., an immunity from trial and the attendant burdens of litigation. If a court had to reach the merits to resolve the immunity question, there would effectively be no immunity. This would be particularly problematic in lawsuits arising from military operations, as any death resulting from such operations could give rise to a plausible allegation that *jus cogens* norms were violated. Second, merging the question of immunity with the merits also undermines the original purpose of foreign official immunity: to avoid affronting the sovereignty of a foreign nation by passing judgment on their official government acts, which would inevitably happen if courts had to reach the merits to resolve immunity.

*Doğan v. Barak*, No. 2:15-cv-08130, 2016 WL 6024416, at *10 (C.D. Cal. Oct. 13, 2016) (cleaned up), *aff'd*, *Doğan*, 932 F.3d 888; *see also Doe 1*, 318 F. Supp. 3d at 234 ("[A] *jus cogens* exception would eviscerate any protection that foreign official immunity affords because an exception merges the merits of the underlying claim with the issue of immunity." (quotations omitted)); Bradley, *supra*, at 11 ("[S]uch an exception would unduly infuse questions about the merits of the plaintiff's claim into the issue of immunity and thereby undercut immunity's protective function.").

Notably, the Executive Branch has not recognized a *jus cogens* exception to immunity. *See Matar*, 563 F.3d at 14; *Doe 1*, 318 F. Supp. 3d at 235. This is important because the common law immunity inquiry focuses on what conduct the *Executive Branch* has determined should be immunized. *See Republic of Mex. v. Hoffman*, 324 U.S. 30, 36 (1945). As the Seventh Circuit explained, pre-*Samantar*:

> Just as the FSIA is the Legislative Branch's determination that a nation should be immune from suit in the courts of this country, the immunity of foreign leaders remains the province of the Executive Branch. The Executive Branch's determination that a foreign leader should be immune from suit even when the leader is accused of acts that violate *jus cogens* norms is established by a suggestion of immunity.

*Ye*, 383 F.3d at 627. One reason the Executive Branch opposes a *jus cogens* exception is a genuine concern that such an exception could threaten immunity for United States officials in foreign courts. *See* John B. Bellinger III, *The Dog that Caught the Car: Observations on the Past, Present, and Future Approaches of the Office of the Legal Adviser to Official Acts Immunities*, 44 VAND. J. TRANSNAT'L L. 819, 833 (2011) ("Once the United States agrees to lift immunity for foreign government officials, it begins to craft state practice that could expose U.S. officials to suits abroad. Plaintiffs [in foreign nations] would certainly allege that certain actions by U.S. officials violate *jus cogens* norms, and would argue that, as a result, such U.S. officials are not entitled to immunity."). Regardless of its underlying policy reasons, "[t]he executive branch's position [opposing] a *jus cogens* exception . . . weighs heavily against the Court adopting an exception on its own." *Doe 1*, 318 F. Supp. 3d at 236.

For these reasons, I conclude there is no *jus cogens* exception to foreign official immunity. Because Obiano is entitled to foreign official immunity, this case should be dismissed for lack of subject matter jurisdiction.

* * *

Make no mistake: Plaintiffs allege truly appalling conduct. The murder of innocent people for their political or religious beliefs is *never* acceptable anywhere, in any form or fashion. Put more eloquently, "torture, extrajudicial killings and other forms of deliberate brutality, anytime, anywhere, pierce the inner core of human baseness and cross the outer crusts of infamy." *Tachiona v. Mugabe*, 169 F. Supp. 2d 259, 316 (S.D.N.Y. 2001). The TVPA is a legislative decision to "impose[] liability on officials who torture or kill under 'actual' authority, 'apparent' authority, or 'color of law' of a foreign nation *and* are unable to invoke foreign-official immunity." *Doe 1*, 318 F. Supp. 3d at 237. Practically speaking, the TVPA "imposes liability on true outlaws, *i.e.*, individuals who commit acts for which no foreign sovereign is willing to accept responsibility—but not individuals

whose conduct is authorized." *Id.* at 238. One court succinctly explained the policy reason for allowing such a framework:

> The purpose of diplomatic and head-of-state immunity is not to cover up heinous deeds from coming to the light of day, or to protect a nation's leaders from accountability for their acts and, by shielding them from reprisals, tacitly condone their wrongs. If there is a larger end here to be served, for which accusations of grave misconduct as between particular individuals may be momentarily set aside, it is in the interest of comity among nations—to safeguard friendly relations among sovereign states.

*Tachiona*, 169 F. Supp. 2d at 317. I understand, and appreciate, why some might fundamentally disagree with the policy choice made by Congress to allow foreign officials who engage in torture and indiscriminate killings to escape civil liability so long as a foreign nation has authorized the conduct. But it is not my role to usurp the legislative function. If Congress wants to set aside common law foreign official immunity, it certainly can do so. I will not legislate from the bench.

## CONCLUSION

For the reasons described above, I recommend that Defendant's Opposed Motion to Dismiss Plaintiffs' Complaint (Dkt. 21) be **GRANTED**.

Plaintiffs also filed a Motion to Exclude Matters Outside the Pleadings in Regards to Defendant's 12(b)(6) Motion to Dismiss, or in the Alternative, to Permit Plaintiffs Discovery According to the Docket Control Order ("Motion to Exclude"). Dkt. 28. Because I recommend this case be dismissed for lack of subject matter jurisdiction under Rule 12(b)(1), I do not reach the Rule 12(b)(6) arguments raised by Obiano. As such, the Motion to Exclude is **DENIED AS MOOT**.

The parties have 14 days from service of this Memorandum and Recommendation to file written objections. *See* 28 U.S.C. § 636(b)(1)(C); F<small>ED</small>. R. C<small>IV</small>. P. 72(b)(2). Failure to file timely objections will preclude appellate review of factual findings and legal conclusions, except for plain error.

SIGNED this 17th day of January 2024.

_____
ANDREW M. EDISON
UNITED STATES MAGISTRATE JUDGE